# EXHIBIT 2

**Registered Agent Solutions, Inc.**
*Corporate Mailing Address*
1701 Directors Blvd.
Suite 300
Austin, TX 78744

Phone: (888) 705-RASi (7274)

# SERVICE OF PROCESS RECEIPT

2022-11-01

Kevin Maxwell
**SMITH & WESSON BRANDS, INC.**
Legal Department
2100 Roosevelt Avenue
Springfield, MA 01104 USA

**NOTICE OF CONFIDENTIALITY**
This notice and the information it contains are intended to be a confidential communication only to the individual and/or entity to whom it is addressed. If you have received this notice in error, immediately call our SOP Department at (888) 705-7274.

**RE:  SMITH & WESSON BRANDS, INC.**

This receipt is to inform you that Registered Agent Solutions, Inc. has received a Service of Process on behalf of the above-referenced entity as your registered agent and is hereby forwarding the attached document(s) for your immediate review.  A summary of the service is shown below; however, it is important that you review the attached document(s) in their entirety for complete and detailed information.
For additional information and instruction, contact the document issuer:  EDELSON PC

| **SERVICE INFORMATION** | | **RASi REFERENCE INFORMATION** | |
|---|---|---|---|
| Service Date: | 2022-11-01 | Service No.: | 0233019 |
| Service Time: | 2:01 PM EDT | RASi Office: | Massachusetts |
| Service Method: | Process Server | Rec. Int. Id.: | EMR |

**CASE INFORMATION**

**ANSWER / APPEARANCE INFORMATION**

| | | | |
|---|---|---|---|
| Case Number: | 22LA00000497 | 30 days | *(Be sure to review the document(s) for any required response dates)* |
| File Date: | 09/29/2022 | | |
| Jurisdiction: | 19TH JUDICIAL CIRCUIT COURT, LAKE COUNTY, ILLINOIS | | |
| Case Title: | ELIZABETH TURNIPSEED V. SMITH & WESSON BRANDS, INC., ET AL. | | |

**AGENCY / PLAINTIFF INFORMATION**

| | |
|---|---|
| Firm/Issuing Agent: | EDELSON PC |
| Attorney/Contact: | ARI J. SCHARG |
| Location: | Illinois |
| Telephone No.: | 312-589-6370 |

**DOCUMENT(S) RECEIVED & ATTACHED**

Complaint
Summons
Affidavit / Certification
Demand for Jury Trial

**ADDITIONAL NOTES**

**Questions or Comments...** Should you have any questions or need additional assistance, please contact the SOP Department at (888) 705-7274.

You have been notified of this Service of Process by Insta-SOP Delivery, a secure email transmission.  The transmitted documents have also been uploaded to your Corpliance account.  RASi offers additional methods of notification including Telephone Notification and FedEx Delivery.  If you would like to update your account's notification preferences, please log into your Corpliance account at www.rasi.com.

*Thank you for your continued business!*

**This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts.**

| STATE OF ILLINOIS, CIRCUIT COURT | SUMMONS | For Court Use Only |
|---|---|---|
| Lake _____ COUNTY | | A TRUE COPY ATTEST 11/1/2022 Process Server & Disinterested Person |

| **Instructions ▼** | |
|---|---|
| Enter above the county name where the case was filed. | Elizabeth Turnipseed, **Plaintiff / Petitioner** (First, middle, last name) |
| Enter your name as Plaintiff/Petitioner. | v. Smith & Wesson Brands, Inc., American Outdoor Brands Corp., Budsgunshop.com, LLC, Red Dot Arms, Inc., Robert Crimo III, and Robert Crimo, Jr., |
| Enter the names of all people you are suing as Defendants/ Respondents. | **Defendant / Respondent** (First, middle, last name) |
| Enter the Case Number given by the Circuit Clerk. | ☑ **Alias Summons** (Check this box if this is not the 1st Summons issued for this Defendant.) |

**22LA00000497**

**Case Number**

| **IMPORTANT INFORMATION:** | There may be court fees to start or respond to a case. If you are unable to pay your court fees, you can apply for a fee waiver. You can find the fee waiver application at: illinoiscourts.gov/documents-and-forms/approved-forms/.

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit illinoislegalaid.org.

Call or text Illinois Court Help at 833-411-1121 for information about how to go to court including how to fill out and file forms. You can also get free legal information and legal referrals at illinoislegalaid.org. |
|---|---|
| **Plaintiff/Petitioner:** | Do not use this form in an eviction, small claims, detinue, divorce, or replevin case. Use the *Eviction Summons, Small Claims Summons, or Summons Petition for Dissolution of Marriage / Civil Union* available at illinoiscourts.gov/documents-and-forms/approved-forms. If your case is a detinue or replevin, visit illinoislegalaid.org for help.

If you are suing more than 1 Defendant/Respondent, fill out a *Summons* form for each Defendant/Respondent. |

| | 1. **Defendant/Respondent's address and service information:** |
|---|---|
| In **1a**, enter the name and address of a Defendant/ Respondent. If you are serving a Registered Agent, include the Registered Agent's name and address here. | a. Defendant/Respondent's primary address/information for service:
Name *(First, Middle, Last):* Smith & Wesson Brands
Registered Agent's name, if any: Registered Agent Solutions
Street Address, Unit #: 44 School Street Suit 505
City, State, ZIP: Boston, MA 02108
Telephone: _____ Email: _____ |
| In **1b**, enter a second address for Defendant/ Respondent, if you have one. | b. If you have more than one address where Defendant/Respondent might be found, list that here:
Name *(First, Middle, Last):* _____
Street Address, Unit #: _____
City, State, ZIP: _____
Telephone: _____ Email: _____ |
| In **1c**, check how you are sending your documents to Defendant/ Respondent. | c. Method of service on Defendant/Respondent:
☐ Sheriff  ☐ Sheriff outside Illinois: _____
                                                                *County & State*
☑ Special process server  ☐ Licensed private detective |

Enter the Case Number given by the Circuit Clerk: 22LA00000497

| In 2, enter the amount of money owed to you. | **2.** | **Information about the lawsuit:** |
| --- | --- | --- |

Amount claimed:   $ In excess of $50,000

| In 3, enter your complete address, telephone number, and email address, if you have one. |
| --- |

**3.** **Contact information for the Plaintiff/Petitioner:**

Name *(First, Middle, Last)*:   Ari J. Scharg

Street Address, Unit #:   350 N LaSalle Street, Suite 1400

City, State, ZIP:   Chicago, IL 60654

Telephone:  (312) 239-3362      Email:   ascharg@edelson.com

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

| **Important information for the person getting this form** | You have been sued. Read all of the documents attached to this *Summons*. To participate in the case, you must follow the instructions listed below. If you do not, the court may decide the case without hearing from you and you could lose the case. *Appearance* and *Answer/Response* forms can be found at: illinoiscourts.gov/documents-and-forms/approved-forms/. |
| --- | --- |

| Check 4a or 4b. If Defendant/Respondent only needs to file an *Appearance* and *Answer/Response* within 30 days, check box 4a. Otherwise, if the clerk gives you a court date, check box 4b. | **4.** | **Instructions for person receiving this** *Summons* **(Defendant):** |
| --- | --- | --- |

☑ a.   To respond to this *Summons*, you must file *Appearance* and *Answer/Response* forms with the court within 30 days after you have been served (*not counting the day of service)* by e-filing or at:

Address:   18 N. County St.

City, State, ZIP:   Waukegan, IL 60085

| In 4a, fill out the address of the court building where the Defendant may file or e-file their *Appearance* and *Answer/ Response.* |
| --- |

☐ b.   Attend court:

On: _____ at _____ ☐ a.m. ☐ p.m. in _____
　　　　*Date*　　　　　　*Time*　　　　　　　　　　　*Courtroom*

**In-person at:**

_____
*Courthouse Address*　　　*City*　　　　　*State*　　　*ZIP*

OR

| In 4b, fill out:
• The court date and time the clerk gave you.
• The courtroom and address of the court building.
• The call-in or video information for remote appearances (if applicable).
• The clerk's phone number and website. All of this information is available from the Circuit Clerk. |
| --- |

**Remotely** (You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance"):

By telephone: _____
　　　　　　　*Call-in number for telephone remote appearance*

By video conference: _____
　　　　　　　　　*Video conference website*

_____
*Video conference log-in information (meeting ID, password, etc.)*

Call the Circuit Clerk at: _____ or visit their website
　　　　　　　　　　　*Circuit Clerk's phone number*

at: _____ to find out more about how to do this.
　　*Website*

| **STOP!** The Circuit Clerk will fill in this section. |
| --- |

Witness this Date:   10/27/2022

Clerk of the Court:   *Erin Cartwright Weinstein*

| **STOP!** The officer or process server will fill in the Date of Service. |
| --- |

This *Summons* must be served within 30 days of the witness date.

Date of Service: _____
　　　　　*(Date to be entered by an officer or process server on the copy of this Summons left with the Defendant or other person.)*

**This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts.**

| STATE OF ILLINOIS, CIRCUIT COURT | PROOF OF SERVICE OF SUMMONS AND COMPLAINT/PETITION | For Court Use Only |
|---|---|---|
| Lake _____ COUNTY | | |

| Instructions | |
|---|---|
| Enter above the county name where the case was filed. | Elizabeth Turnipseed, _____<br>**Plaintiff / Petitioner** (First, middle, last name) |
| Enter your name as Plaintiff/Petitioner. | |
| Enter the names of all people you are suing as Defendants/ Respondents. | v. Smith & Wesson Brands, Inc., American Outdoor Brands Corp., Budsgunshop.com, LLC, Red Dot Arms, Inc., Robert Crimo III, and Robert Crimo, Jr., _____<br>**Defendant / Respondent** (First, middle, last name) |
| Enter the Case Number given by the Circuit Clerk. | ☐ **Alias Summons** (Check this box if this is not the 1st Summons issued for this Defendant.) |

**22LA00000497**

**Case Number**

**\*\*Stop. Do not complete the form. The sheriff or special process server will fill in the form.\*\***

**My name is** _____ **and I state**
        *First, Middle, Last*

☐ I served the *Summons* and Complaint/Petition on the Defendant/Respondent

_____ **as follows:**
*First, Middle, Last*

    ☐ Personally on the Defendant/Respondent:
    Male ☐ Female ☐ Non-Binary ☐ Approx. Age: _____ Race: _____
    On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address, Unit#: _____
    City, State, ZIP: _____

    ☐ On someone else at the Defendant/Respondent's home who is at least 13 years old and is a family
    member or lives there:
    On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address, Unit#: _____
    City, State, ZIP: _____
    And left it with: _____
                   *First, Middle, Last*
    Male ☐ Female ☐ Non-Binary ☐ Approx. Age: _____ Race: _____
    and by sending a copy to this defendant in a postage-paid, sealed envelope to the
    above address on _____ , 20 _____ .

    ☐ On the Corporation's agent, _____
                           *First, Middle, Last*
    Male ☐ Female ☐ Non-Binary ☐ Approx. Age: _____ Race: _____
    On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
    Address: _____
    City, State, ZIP: _____

Enter the Case Number given by the Circuit Clerk: 22LA00000497

☐ **I was not able to serve the** *Summons* **and Complaint/Petition on Defendant/Respondent:**

_____
*First, Middle, Last*

I made the following attempts to serve the *Summons* and Complaint/Petition on the Defendant/Respondent:

1. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____

2. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____

3. On this date: _____ at this time: _____ ☐ a.m. ☐ p.m.
   Address: _____
   City, State, ZIP: _____
   Other information about service attempt: _____
   _____
   _____
   _____

| **DO NOT** complete this section. The sheriff or private process server will complete it. | **If you are a special process server, sheriff outside Illinois, or licensed private detective, your signature certifies that everything on the** *Proof of Service of Summons* **is true and correct to the best of your knowledge. You understand that making a false statement on this form could be perjury.** |
|---|---|

| Under the Code of Civil Procedure, <u>735 ILCS 5/1-109</u>, making a statement on this form that you know to be false is perjury, a Class 3 Felony. | **By:** _____ |

*Signature by:*  ☐ Sheriff
 ☐ Sheriff outside Illinois: _____

 *County and State*
 ☐ Special process server
 ☐ Licensed private detective

**FEES**
Service and Return: $ _____
Miles _____ $ _____
Total $ 0.00

_____
*Print Name*

If *Summons* is served by licensed private detective or private detective agency:
License Number: _____

[ Print Form ]     [ Save Form ]     [ Reset Form ]

FILE[D]
9/29/2022 10:58 A[M]
ERIN CARTWRIGHT WEINSTEI[N]
Clerk of the Circuit Cou[rt]
Lake County, Illinoi[s]

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

ELIZABETH TURNIPSEED,     )
                           )
            **Plaintiff(s)**     )
        vs.               )
                           )
SMITH & WESSON BRANDS, INC., et al.,    )
            **Defendant(s)**    )

Gen No:   22LA00000497

AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222 (B)

Pursuant to Supreme Court Rule 222 (B), counsel for the above-named plaintiff certifies that plaintiff seeks money damages in excess of Fifty Thousand and 00/100 Dollars ($50,000).

By

One of Attorneys for Plaintiff

Prepared by:
Name: Ari J. Scharg        Pro Se ☐
Address: 350 N LaSalle Street, 14th Floor
City: Chicago     State: IL
Phone: (312) 239-3362    Zip Code: 60654
ARDC #: 6297536
Fax: (312) 589-6378
E-mail address: ascharg@edelson.com

#171-312 (Rev 12/17)

FILE[...]
**9/29/2022 10:58 A[...]**
IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT **ERIN CARTWRIGHT WEINSTEI[...]**
LAKE COUNTY, ILLINOIS
**Clerk of the Circuit Cou[...]**
**Lake County, Illinoi[...]**

|   |   |
|---|---|
| ELIZABETH TURNIPSEED, | ) |
|  | ) |
| Plaintiff(s) | ) |
| vs. | ) |
|  | ) |
| SMITH & WESSON BRANDS, INC., et al., | ) |
| Defendant(s) | ) |

Gen No: 22LA00000497

## JURY DEMAND

The ☐ plaintiff(s) ☐ defendant(s) in the above entitled cause demand a jury for trial of said cause.

By: _____

Their Attorney(s)/Pro Se

Prepared by:

Attorney's Name: Ari J. Scharg
Address: 350 N LaSalle Street, 14th Floor
City: Chicago          State: IL
Phone: (312) 239-3362     Zip Code: 60654
ARDC: 6297536
Fax: (312) 589-6378
E-mail address: ascharg@edelson.com

171-109 (Rev 10/13)

FILE
9/28/2022 8:09 A
ERIN CARTWRIGHT WEINSTEI
Clerk of the Circuit Cou
Lake County, Illino

IN THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| ELIZABETH TURNIPSEED, | Case No. |
| *Plaintiff,* | **22LA00000497** |
| v. | |
| SMITH & WESSON BRANDS, INC., a Nevada corporation, AMERICAN OUTDOOR BRANDS CORPORATION, a Nevada corporation, BUDSGUNSHOP.COM, LLC, a Kentucky limited liability company, RED DOT ARMS, INC., an Illinois corporation, ROBERT CRIMO III, an individual, ROBERT CRIMO, JR., an individual, | |
| *Defendants,* | |

NOTICE
PURSUANT TO LCR - 2-2.14
THIS CASE IS HEREBY SET FOR AN INITIAL CASE MANAGEMENT CONFERENCE
IN COURTROOM _____ ON _____
AT _____ A.M./P.M.
FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR
AN ORDER OF DEFAULT BEING ENTERED.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Elizabeth Turnipseed ("Turnipseed" or "Plaintiff") brings this Complaint and Demand for Jury Trial against Defendants Smith & Wesson Brands, Inc. ("Smith & Wesson"), American Outdoor Brands Corporation ("American Outdoor"), Budsgunshop.com, LLC ("Bud's Gun Shop"), Red Dot Arms, Inc. ("Red Dot Arms"), Robert Crimo III (the "Shooter"), and Robert Crimo, Jr. ("Crimo Jr.") (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1.     On the morning of July 4, 2022, thousands of Highland Park community members and their families gathered downtown to celebrate America's birthday at the city's annual Independence Day Parade.

2.     As families were setting up chairs and strollers along the Central Avenue parade route, the Shooter was setting up in sniper position on a roof above them, preparing to carry out the final stage of a horrific attack on civilians that he had been planning for weeks. The Shooter

was incapable, on his own, of causing even a fraction of the physical and emotional carnage that he would soon unleash.

3.  To carry out a military-style assault, the Shooter used his Smith & Wesson M&P 15 semiautomatic, AR-15 style rifle (the "Rifle") to unleash more than 80 rounds into the sea of families and children innocently watching the parade below (the "Incident"). The bullets ripped through 55 human bodies in just 60 seconds, leaving 7 people dead and 48 others lying injured with gunshot wounds. Plaintiff Elizabeth Turnipseed was shot in her pelvis while standing next to her husband and three-year-old child.

4.  The Incident was foreseeable.

5.  Smith & Wesson and its former parent company, American Outdoor Brands (collectively, "Smith & Wesson"),[1] unfairly, deceptively, and unlawfully markets its military-style assault rifle in a way that attracts, encourages, and facilitates mass shooters, including by:

   i.  developing marketing campaigns that target impulsive young men with military complexes who were particularly likely to be attracted to the unique ability of AR-15 style weapons;

   ii.  developing marketing campaigns that target adolescents drawn to the excitement and risk-taking associated with militaristic weapons or combat missions, particularly young players of popular and realistic first-person shooter video games like Call of Duty, which prominently feature variants of the weapons sold by Smith & Wesson in real life; and

   iii.  marketing their AR-15 style weapons as well-suited for civilians to carry out offensive military-style combat missions against their perceived enemies.

6.  Plaintiff brings claims against Smith & Wesson for violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") and negligence.

---

[1] On May 29, 2020, American Outdoors and Smith & Wesson merged into one corporation, Smith & Wesson Brands, Inc. Prior to that merger, Smith & Wesson Brands, Inc. was a wholly owned subsidiary of American Outdoor Brands.

7.      Defendant Bud's Gun Shop sold the Rifle to the Shooter, despite that it is illegal for residents of Highland Park and Highwood, Illinois to possess assault weapons.[2] Bud's Gun Shop then shipped the Rifle to Red Dot Arms, a gun dealer located in Illinois, which transferred the Rifle to the Shooter. Both Bud's Gun Shot and Red Dot Arms (together the "Gun Store Defendants") knew the Shooter's residential address, and thus knew that they were selling an assault rifle to a resident of a municipality that prohibited the possession of such weapons. Nevertheless, they proceeded with the sale and transfer, enabling the Shooter to carry out his deadly mission.

8.      Plaintiff brings claims against the Gun Store Defendants for negligence.

9.      Defendant Robert Crimo, Jr. is the father of the Shooter and facilitated his ability to purchase the Rifle used in the Incident despite knowing of the Shooter's propensity and desire to commit mass violence.

10.     Plaintiff brings claims against Defendant Robert Crimo, Jr. for negligence and negligent infliction of emotional distress.

11.     Plaintiff brings claims against the Shooter for assault and battery and intentional infliction of emotional distress for his military-style assault designed to injure, maim, or kill a large number of people at the Highland Park parade.

12.     But for the misconduct of all Defendants, Plaintiff would not have been harmed.

13.     This lawsuit does not seek to hold firearms manufacturers and/or sellers liable for responsibly marketing weapons for use by law-abiding citizens while complying with all relevant standards of care and applicable laws designed to prevent unlawful acts of violence.

---

[2] The Shooter is publicly associated with two residential addresses: one in Highwood and one in Highland Park. Both cities prohibit possession of assault rifles like the M&P 15 Rifle at issue.

3

14.     Instead, this lawsuit seeks to impose liability for irresponsible and unlawful conduct by a firearms manufacturer for marketing weapons in an unsafe and illegal manner.

### PARTIES

15.     Plaintiff Elizabeth Turnipseed is a natural person and resident of Highland Park, Illinois.

16.     Defendant American Outdoor Brands Corporation was a Nevada corporation doing business in the State of Illinois and was the parent company of Smith & Wesson Brands, Inc.—the manufacturer of the Rifle used by the Shooter in the Incident.

17.     As of May 29, 2020, American Outdoor Brands Corporation and Smith & Wesson Brands, Inc. merged to create Defendant Smith & Wesson Brands, Inc, a Nevada corporation doing business in the State of Illinois.

18.     Defendant Bud's Gun Shop is and at all relevant times has been a distributor of firearms and is federally licensed to deal in firearms. Bud's Gun Shop is headquartered in Lexington, Kentucky. It has multiple physical locations in Kentucky and Tennessee, as well as a large online retail presence.

19.     Upon information and belief, in or around June or July of 2020, Bud's Gun Shop sold the Shooter the Rifle that he used in the shooting in Highland Park on July 4, 2022.

20.     Defendant Red Dot Arms is a retail gun store located in Lake County, Illinois. Upon information and belief, in or around June or July of 2020, it transferred the Rifle to the Shooter.

21.     Defendant Robert Crimo III is a natural person and Illinois resident. The Shooter is currently being held in custody in the Lake County Jail and has been charged with 21 counts of first-degree murder, 48 counts of attempted murder and 48 counts of aggravated battery.

4

22. Defendant Robert Crimo, Jr. is a natural person and Illinois resident.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over this matter pursuant to Article VI, Section 9 of the Illinois Constitution.

24. This Court has jurisdiction over Defendants pursuant to 735 ILCS 5/2-209 because they conduct business transactions in Illinois, have committed tortious acts in Illinois, and have transacted substantial business in Illinois that caused harm in Illinois, including business that is the subject matter of this complaint.

25. Venue is proper in this court under 735 ILCS 5/2-101 and 5/2-102, as the transactions and occurrences that form the basis for this complaint occurred, in part, in Lake County, and Red Dot Arms as well as the Shooter and Crimo Jr. reside in Lake County.

## FACTUAL ALLEGATIONS

### *The Smith & Wesson M&P 15 Is A Weapon of War*

26. The Rifle used by the Shooter to carry out the horrific attack in Highland Park was a Smith & Wesson M&P 15, an AR-15 style semiautomatic assault rifle.

27. AR-15 style rifles are, by design, military weapons. After World War II, the U.S. Army's Operations Research Office analyzed millions of casualty reports from World Wars I and II and observed that modern combat occurred at short range and casualties were most often dependent on the total number of shots fired.

28. These findings led the U.S. Army to develop specifications for a new combat weapon: a lightweight firearm that would hold a large detachable magazine and rapidly expel ammunition with enough velocity to penetrate body armor and steel helmets. This new firearm would give soldiers the ability to *lay down a high volume of fire over a wide killing zone*, also

5

known as "hosing down" an area.

29.     In response, a company called ArmaLite designed the now-infamous AR-15 (or ArmaLite Rifle). Armalite's goal was to create a lightweight, portable, select-fire rifle that would allow combatants to quickly put many rounds on target, from distances of 500 yards.[3] That is, the AR-15 was designed to be effective in combat by killing as many enemy soldiers as possible as quickly as possible, even from far away.

30.     After extensive testing, the military concluded that the AR-15 had superior "hit-and-kill" potential in combat situations—resulting in instantaneous deaths, as well as routine amputations, decapitations, and massive body wounds—and ultimately adopted the AR-15 as its standard-issue service rifle (renaming it the M16). Armalite's design performed so well that the Pentagon concluded that a "5- to 7- man squad armed with the AR-15 would be as effective as a 10-man squad armed with" the military's previous standard-issue weapon.[4]

31.     Seeking to capitalize on the military's "approval" of the AR-style rifle, the firearm industry introduced semiautomatic versions of military assault weapons for sale to the public in order to create and exploit new civilian markets for these deadly weapons. Though federal law bans the sale of *fully* automatic assault rifles—*i.e.*, rifles that fire continuously when the trigger is held—to civilians, firearm manufacturers began producing *semi*-automatic assault weapons, that replaced the fully automatic trigger with one that must be pulled back separately for each round fired.

---

[3] Tim Dickinson, *How the AR-15 Became Mass Shooters' Weapon of Choice*, ROLLING STONE (Feb. 22, 2018), https://www.rollingstone.com/politics/politicsfeatures/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice107819/.

[4] *Id.* (internal quotation marks omitted); *see also Worman v. Healey*, 849 F.3d 114, 124 (4th Cir. 2017).

32.    Smith & Wesson incorporated into their design *specific* features that enable

shooters to spray ("hose down") a large number of bullets over a broad killing zone without

having to aim at each individual target. These features not only give assault weapons a

distinctive appearance, they make it easy to simply point the gun while rapidly pulling the

trigger—including firing from the hip, a procedure seldom used in hunting anything but human

beings. The most important of these design features include:

     i.  **"High-capacity" detachable ammunition magazines** that hold as many as 100 rounds of ammunition. This allows the high volume of fire critical to hosing down a broad killing zone with no interruption for reloading;

    ii.  **A rear pistol grip** (handle), including so-called "thumb-hole stocks" and magazines that function like pistol grips to enable easier and more rapid shooting;

   iii.  **A forward grip or barrel shroud**. Forward grips (located under the barrel or the forward stock) give a shooter greater control over a weapon during recoil. Forward grips and barrel shrouds also make it possible to hold the gun with the non-trigger hand, even though the barrel gets extremely hot from firing multiple rounds; and

   iv.  **Modifiable for automatic fire.** A design that allows for easy modification for automatic fire gives a would-be mass shooter an additional means to increase the lethality of the weapon, subverting federal restrictions on automatic weapons.

33.    These design features create the ability to quickly lay down a high volume of fire,

making semiautomatic assault weapons a particularly dangerous addition to the civilian gun

market. They explain why assault weapons are favored by terrorists, mass killers, and violent

criminals, and they distinguish such weapons from true hunting and target guns.

34.    Deliberate, aimed fire from the shoulder may be more accurate than the "hosing

down" of an area for which assault weapons were designed. But mass murderers and other

violent criminals drawn to assault weapons are not after marksmanship medals. They want to kill

or maim as many people as possible in as short a time as possible—the exact job for which the semiautomatic assault weapon was designed.

***Smith & Wesson Knew That Civilian Assault Rifles Posed An Extreme Public Danger And Did Not Begin Selling Them Until After The PLCAA Was Enacted***

35.     In 1977, the ArmaLite's patent on the AR-15 rifle lapsed, and gun manufacturers began producing and selling civilian variants. When the ban on military-style semiautomatic assault rifles expired in 2004, gun manufacturers immediately began selling their semiautomatic assault rifles against to the civilian gun market. Yet, Smith & Wesson would wait 2 more years before manufacturing and selling them.

36.     During that time, Smith & Wesson partnered with the National Rifle Association and spent millions of dollars of its own money lobbying Congress for a new federal law that they hoped would shield gun makers from lawsuits filed against them when their guns, including assault rifles, were used to kill or injure people. Then-Smith & Wesson President and Chief Executive Officer Michael Golden personally lobbied legislators and was "amazed how easy it is to get audiences with key members of the House and Senate and the agencies" after making millions of dollars in political contributions.[5]

37.     These lobbying efforts resulted in the passage the Protection of Lawful Commerce and Arms Act ("PLCAA"), which was signed into law on October 25, 2005. On the next earnings call, Golden told investors he "had the honor of attending the signing of the [PLCAA]" and that it marked "a great day for our industry and for me personally."

---

[5] Leslie Wayne, *After taking bullets, Smith & Wesson lives*, N.Y. TIMES (Apr. 6, 2006), https://www.nytimes.com/2006/04/06/business/worldbusiness/after-taking-bullets-smith-wesson-lives.html.

38.     Within just a few months of the PLCAA being signed into law, Smith & Wesson entered the civilian assault weapons market and began selling the M&P 15.

39.     Since then, Smith & Wesson has enjoyed record-breaking sales and profits from its M&P 15 rifles, even as gun deaths and mass shootings have risen in the United States.

40.     By 2020, Smith & Wesson became the second largest maker of rifles in the United States.

41.     Between 2012 and 2021, Smith & Wesson generated more than $695 million in revenue from its M&P 15 sales.

42.     Smith & Wesson recognizes that its revenues increase when mass shootings are committed. In its 2019 10-K filing, Smith & Wesson acknowledged that speculation about the passage of gun violence prevention legislation—speculation which often increases in the wake of a mass shooting—can "often . . . result in increased near-term consumer demand" for Smith & Wesson products.

43.     As shown below, Smith & Wesson has made the decision to market its assault rifles in whichever ways will result in the most sales, even if its marketing attracts a dangerous category of consumers.

***Smith & Wesson Marketed and Designed the Rifle in a Way That Attracted and Enabled Dangerous Individuals Like the Shooter***

44.     Smith & Wesson failed to use reasonable care in marketing, advertising, and promoting its Rifle.

### Smith & Wesson's Marketing Attracted a Dangerous Category of Consumers

45.     When Smith & Wesson marketed the Rifle, it knew or should have known of the existence of a category of consumers containing individuals like the Shooter, who would be attracted to such a weapon and could pose a tremendous risk to the safety of others—namely

impulsive young men with hero complexes and/or militaristic delusions attracted to using the particularly high lethality of AR-15 style weapons like the Rifle to effectively execute their fantasies.

46.     Decades of scientific evidence demonstrates that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood. As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky, impulsive behaviors. Moreover, negative emotions such as anger, depression, and anxiety—which are more strongly felt by adolescents—can dilute the already weak control adolescents and post-adolescents exercise over their impulses and urges.

47.     Studies have further shown that this susceptibility to and predilection for risky, thrill-seeking behavior extends to violent criminal behavior. Indeed, a disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, and 18- to 20-year-olds are offenders in gun homicides at a rate nearly four times higher than adults 21 and older.

48.     Adolescents and young adults also exhibit increased susceptibility to advertisements, and research indicates that they are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior.

49.     Research further suggests that one propensity can feed the other: young people may be particularly responsive to advertisements portraying impulsive or risky behavior when they are in a negative emotional state involving, for instance, depression or anger. As studies have shown, such young people are more vulnerable to acting on impulse to seek immediate

10

gratification.

50.      For individuals with risk factors to violence, particularly emotionally troubled young men, the physical presence of assault weapons and related imagery make violent actions more likely. The medical literature describes a "weapons effect," wherein the physical presence of a firearm may incite aggressive cognition and provoke violent behavior. Violence has infectious qualities: individuals may emulate previous killers or violent acts they've observed, a concept known as "identification." Assault weapons advertisements also activate people who are predisposed to violence but might not engage in it if they did not have access to the weapons.

51.      Nonetheless, Smith & Wesson targets its advertising to exactly this vulnerable group: emotionally troubled young men. Young consumers represent a significant part of the growth in the sales of Smith & Wesson's M&P rifles, and Smith & Wesson has emphasized to its investors that young adults represent the growth area for new consumers of firearms.

52.      Smith & Wesson knows the data and the research. According to Smith & Wesson's public filings, the company does "a lot of analytics" about its markets, including "a lot of predictive work." Smith & Wesson knows that young men will be especially susceptible to advertisements that imply endorsement by the military and law enforcement and that offer them a real-life version of the adrenaline-filled experiences they've had in first-person shooter games. Smith & Wesson designs these advertisements to take advantage of young men's impulsive behavior and lack of self-control in order to increase sales of its M&P rifles.

53.      But Smith & Wesson also knows the data about mass shootings. Smith & Wesson knows that the same demographic it targets with its advertisements is disproportionately likely to commit a mass shooting.

54.      Smith & Wesson knew or should have known, among other facts, that:

(a)    The United States has been plagued by a series of deadly mass shootings, many of which were conducted by disturbed, violent young men wielding AR-15 style assault weapons.

(b)    Many of the mass shootings committed in the United States over the last 10 years with the highest numbers of gunshot injuries and deaths were perpetrated by male shooters who were between the ages of 19 and 28.

(c)    Many young mass shooters have used AR-15 style weapons like the Rifle in highly publicized mass shootings preceding the Incident, including:

    i.    the 24 year-old man who killed 12 and injured 70 in an attack at a movie theater in Aurora, Colorado in July 2012;

    ii.    the 20 year-old man who killed 27, including 20 children, and injured 2 in an attack at an elementary school in Sandy Hook, Connecticut in December 2012;

    iii.    the 26 year-old man who killed 26 and injured 20 in an attack at a church in Sutherland Springs, Texas in November 2017;

    iv.    the 19 year-old man who killed 17 and injured 17 in an attack at Marjorie Stoneman Douglas High School in Parkland, Florida in February 2018; and

    v.    the 19 year-old man who killed 1 and injured 3 in an attack at the Chabad of Poway synagogue in Poway, California; and

    vi.    the 28 year-old man and his wife who killed 14 and injured 22 others in an attack at the San Bernadino Inland Regional Center in San Bernadino, California in December 2015

(d)    The Aurora, Parkland, San Bernadino, and Poway attackers all used Smith & Wesson M&P 15 rifles—the same Rifle used by the Highland Park Shooter—to commit their mass shootings.

55.    Accordingly, Smith & Wesson had actual or constructive knowledge that:

(a)    Young men like the Shooter are generally more susceptible to advertising

12

than fully neurologically developed adults;

(b)   Young men like the Shooter are disproportionately prone to irresponsible, impulsive and thrill-seeking behavior;

(c)   Young men like the Shooter are more likely to harbor delusional, militaristic fantasies involving acting as a supposed hero eradicating large groups of perceived enemies;

(d)   Young men like the Shooter are particularly attracted to highly lethal AR-15 style weapons like the Rifle in mass shootings because they fulfill their fantasies; and

(e)   AR-15 style weapons are particularly attractive to mass shooters because, *inter alia*, they allow shooters to rapidly expend large numbers of bullets at multiple targets.

56.   At all relevant times, Smith & Wesson was aware and had actual or constructive knowledge of the fact that its marketing had the effect of attracting this category of consumers.

57.   Smith & Wesson has been aware since at least 2000 that its marketing practices played a role in contributing to gun crimes, when the company negotiated a settlement agreement with the federal government ("2000 Settlement Agreement") and agreed, *inter alia*, to "[n]ot market any firearm in a way that would make the firearm particularly appealing to juveniles or criminals" due to the foreseeable risk of such advertising fueling unlawful acts of violence by such actors.

58.   Smith & Wesson chose to defy the safe marketing practices it committed to in the 2000 Settlement Agreement, and instead chose to continue targeting young consumers.

**Smith & Wesson's Use of the First-Person Shooter Aesthetic Marketing**

59.     When Smith & Wesson first began selling M&P 15 assault rifles in 2006, then-President and Chief Executive Officer Michael Golden acknowledged, in discussing the launch of the M&P rifle brand, that the company was marketing weapons as "tactical," stating: "We also believe that our M&P rifle series fills a tremendous gap in the marketplace by delivering high-quality, feature-rich tactical rifles that will be readily available in commercial channels."

60.     Smith & Wesson designed advertisements for its products to mimic the aesthetic of being the shooter in a video game ("first-person shooter aesthetic"). These types of video games are disproportionately popular among young men like those in the class of individuals described above.

61.     This first-person shooter aesthetic is used in many popular games, including in the Call of Duty video game franchise, which is popular among teens and young adults, including the Highland Park Shooter. Call of Duty is played by more than 400 million people and is played by at least 6.5 million people on a daily basis.[6] In Call of Duty, players step into the shoes of members of the military or law enforcement and seek to complete virtual combat missions.

62.     The screenshot below is actual game footage from Call of Duty: WWII.

---

[6] Tisha Apolinario, How Many People Play Call of Duty, FICTION HORIZON (Mar. 11 2022), https://fictionhorizon.com/how-many-people-play-call-of-duty-user-growth-stats/.

14



**Official Call of Duty® : WWII Insider - Loadouts**
204,870 views · Jan 3, 2018

63. Smith & Wesson's advertising mimics this first-person shooter aesthetic including in, but not limited to, the following examples:

    (a) Smith & Wesson published the following advertisement for its M&P series of rifles on its corporate channel on the popular social media site YouTube:



**M&P Rifle Experience Commercial**
18,388 views

    (b) Smith & Wesson published the following advertisement for its M&P series

15

of rifles:



(c)     Smith & Wesson published an advertisement that encouraged people to

"Experience real-life first-person shooting with the Smith & Wesson M&P rifle"

and displayed the following scene showing a shooter loading an M&P 15 rifle

from the first-person shooter perspective, with what appears to be a high-capacity

magazine, as the narrator invited viewers to "Experience more adrenaline"[7]:

---

[7] Smith & Wesson, *Get the Experience*, ISPOT.TV (Feb. 26, 2015),
https://www.ispot.tv/ad/7a72/smith-and-wesson-m-and-p-rifle-get-the-experience.

16



64.     Smith & Wesson ads mimicking such games are aimed at appealing to young and predominantly male consumers of these first-person shooter games, who are excited by and attracted to reenacting their video game experience in real life. These advertisements gamify the use of firearms in real life, glorify the lone gunman and the militaristic design of the M&P 15, and indicate that its AR-15 style weapons are well-suited for civilians to carry out offensive military-style combat missions against their perceived enemies.

65.     Smith & Wesson chose to publish its advertisements and establish a marketing presence on social media platforms disproportionately visited by younger consumers, including but not limited to YouTube, Instagram, and Facebook (@smithwessoninc, @smithandwessongear, and facebook.com/SmithandWessonInc).

66.     Smith & Wesson chose to market its M&P series using images of children handling its firearms, distributing those images over social media.

67.     Smith & Wesson targeted youth despite the fact that many states, including Illinois, impose age restrictions preventing youth from lawfully possessing its M&P rifles.

**Smith & Wesson's Misleading Association with Military and Law Enforcement**

68.     Smith & Wesson's marketing campaign caters to the characteristics and preferences of the above dangerous category of individuals and promotes the Rifle's suitability

17

for offensive military-style combat missions by repeatedly and falsely associating Smith &
Wesson civilian products, like the Rifle, with United States military and law enforcement,
including but not limited to, by:

    (a)    falsely representing or suggesting that Smith & Wesson products are utilized
or endorsed by military and law enforcement;

    (b)    using "M&P" in the "M&P 15" designation of the Rifle to stand for
"Military & Police"; and

    (c)    showing Smith & Wesson products similar to the Rifle being used by or
positioned near individuals wearing what appear to be military and/or law
enforcement uniforms or gear, with text resembling oaths taken by military and/or
law enforcement personnel, and implying that Smith & Wesson products are
"[s]elected" or "[c]hosen" by these groups, reinforcing this association with
pictures of American flags.

69.    Examples of advertisements reflecting this facet of Smith & Wesson's marketing
campaign—and specifically involving M&P weapons like the Rifle—include but are not limited
to the following:

    (a)    Smith & Wesson ran the below advertisement for its M&P brand weapons—
including both the M&P rifle series and its related M&P line of handguns:



(b)     Smith & Wesson published the following M&P rifle series advertisement:



(c)     Smith & Wesson produced the following advertisement to promote its

M&P brand of weapons:

19



(d)     Smith & Wesson also produced the below advertisement, which describes an M&P rifle as enabling "reliability when your job is to serve and protect," echoing the motto of the Los Angeles Police Department, "to protect and to serve." This advertisement explicitly spells out the fact that M&P stands for "Military and Police", and even features a new "M&P" logo that incorporates the words "Military" and "Police" into the design:



70.     The advertisement above further highlights that the Rifle comes with a 30-round magazine. No Smith & Wesson firearm product holds more ammunition than the M&P 15.

20

Importantly, Smith & Wesson does not highlight the magazine capacity in advertisements for any of the other firearms it sells for legal civilian purposes, such as hunting and sport shooting.

71.    Smith & Wesson has even run promotions where buyers of its M&P 15 Rifle would receive "5 FREE MAGAZINES":



72.    In publicly available documents, Smith & Wesson has referred to the strategy of associating its products with the military and law enforcement for the purpose of attracting civilian consumers as the "halo effect." Smith & Wesson has explained to investors that the "halo [effect]" benefits the M&P brand by conferring "credibility" on M&P products in the eyes of civilian consumers.

73.    This supposed association of Smith & Wesson M&P brand products with the United States military and law enforcement agencies is a fiction aimed at deceiving the public and attracting the above-described dangerous class of would-be mass shooters. It also promotes the notion that Smith & Wesson weapons are well-suited for offensive military-style combat missions.

21

74.     By cloaking products generally sold to the public in the heroic aura of United States military and law enforcement, Smith & Wesson marketing suggests to individuals that buying a Smith & Wesson product like the Rifle will enable them to model behavior of military and law enforcement personnel.

75.     The intent of this branding and marketing campaign is clear: to increase civilian sales by conveying the deceptive implied claim that M&P AR-15s are approved and used by the U.S. military and law enforcement. Smith & Wesson's emphasis on militaristic and law enforcement imagery in its M&P rifle series marketing aligns with advice from the National Shooting Sports Foundation to the industry in 2017 that the segment of the consumer market "most likely to purchase [an AR-15-style rifle] . . . places value on firearms that have been recommended or used by professionals."

76.     The implication that Smith & Wesson's rifles are endorsed or regularly used by the United States military and law enforcement increases their "credibility" and consequently makes it more likely that consumers will purchase them. The company's public statements regarding its "halo effect" strategy reveal Smith & Wesson's belief that those associations are material to consumers.

77.     As discussed throughout this Complaint, in addition to capitalizing on the "halo effect" through advertising infused with military and law enforcement imagery, Smith & Wesson publishes advertisements for its M&P rifles that gamify shooting, glorify the lone gunman, and glorify the militaristic design, functionality, and appearance of its M&P 15.

78.     Smith & Wesson's marketing and advertising also caters to the propensity for thrill-seeking behavior disproportionately exhibited by impulsive young men like the Shooter by associating Smith & Wesson products like the Rifle with the adrenaline-pumping experience of

combat.

79.    Smith & Wesson's marketing and advertising repeatedly emphasizes the ability of Smith & Wesson weapons to function in combat-like scenarios and quickly dispatch a large number of perceived enemies with a torrent of fire.

80.    Examples of advertisements illustrating this message include, but are not limited to, the advertisements identified throughout this complaint, as well as the following:

(a)    Smith & Wesson advertises its M&P 15 rifle by emphasizing that its weapon gives shooters "Pure Adrenaline" and lets them "KICK BRASS" by "[b]urn[ing] through all the ammunition you want":



(b)    Smith & Wesson touts that its M&P firearms are "capable of handling as many rounds as you are":



Precision-built for accuracy and reliability, M&P® firearms are designed to stand up to the conditions you're facing day in and day out. We're confident that your M&P® firearm is capable of handling as many rounds as you are. With an ever-expanding line of full-size, compact and sub-compact pistols, revolvers and patrol rifles, the M&P® brand continues to bring innovative, dependable firearms to the most demanding military and law enforcement professionals.

(c)     Smith & Wesson also promotes an endorsement on its YouTube channel from a professional shooter who describes using the weapon to achieve a "world record" in speed shooting by firing 10 shots into four different targets in just 1.59 seconds.[8]

81.     The narratives conveyed by Smith & Wesson's advertising combine to promote its products in a way which increased the likelihood of their foreseeable misuse by individuals like the Shooter.

82.     The advertisements and marketing tactics described above demonstrate that Smith & Wesson knowingly marketed, advertised, and promoted the Rifle to civilians for illegal purposes, including to carry out offensive, military style combat missions against their perceived enemies.

83.     Since 2006, Smith & Wesson has sought to grow the market for its M&P 15 Rifle by extolling the militaristic and assaultive qualities of their AR-15 rifles and, specifically, the weapon's suitability for offensive combat missions.

---

[8] *See* Smith & Wesson, Inc., *Smith & Wesson M&P 15 T Rifle with Jerry Miculek*, YOUTUBE (Apr. 21, 2017), https://www.youtube.com/watch?v=guNHME8cB0M.

24

84.     Smith & Wesson's militaristic marketing reinforces the image of its M&P 15 Rifle as a combat weapon that is intended to be used for the purposes of waging war and killing human beings.

85.     Consistent with that image, Smith & Wesson further promoted the M&P 15 Rifle as a combat weapon system by touting in their product advertisements that the Rifle comes with a 30-round magazine.

### Smith & Wesson Designed The Rifle For Easy Modification to Automatic Fire

86.     Smith & Wesson violated federal prohibition on the sale of "machinegun[s]" to the general public either directly or as accomplices.

87.     The federal National Firearms Act ("NFA") defines "machinegun" as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person

26 U.S.C. § 5845(b).

88.     Section 922(b)(4) of 18 U.S.C. prohibits the sale of "machinegun[s]" to members of the general public who, like the Shooter, have not undergone a required registration process.

89.     The definition of "machinegun" under the NFA includes not only weapons that are designed to function as fully automatic firearms when they leave the factory but also weapons that are designed to be easily modified to fire in a fully automatic capacity and/or approximate the rate of fire of a fully automatic weapon.

90.     An automatic weapon will continue firing rounds as long as a shooter keeps the trigger depressed with his or her finger and the gun has any ammunition remaining.

91.     In contrast, a semi-automatic weapon requires the user to squeeze the trigger to

25

discharge each bullet.

92.     In 1982, the Bureau of Alcohol, Tobacco Firearms and Explosives underscored that the NFA definition of "machinegun[s]" includes "those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts."

93.     AR-15 style weapons like the Rifle are "machinegun[s]" because they can be easily modified to facilitate automatic fire.

94.     Congress restricted the sale and possession of "machinegun[s]" because automatic fire weapons pose an undue risk to members of the public, provide no or negligible benefit to law-abiding civilian users, and will be disproportionately likely to be misused by bad actors like the Shooter in a mass shooting.

95.     Instead of significantly altering the design of AR-15 style weapons to reduce their utility in combat-like situations and to adapt the weapons to the legitimate needs of law-abiding civilians, Smith & Wesson made few changes to the basic AR-15 design when producing weapons like the Rifle for the civilian market.

96.     In particular, upon information and belief, the Rifle's internal parts and exterior components like the barrel, rail, and stock remained almost identical to and interchangeable with those of the military-model AR-15.

97.     The only critical difference was, upon information and belief, the removal of the selector switch.

98.     Upon information and belief, Smith & Wesson designed weapons like the Rifle so that they can be readily modified to function as fully automatic weapons or approximate a fully automatic rate of fire in a variety of ways.

26

99.     For example, weapons like the Rifle can be easily modified to accomplish this goal by individuals with minimal financial resources and little to no gunsmithing expertise through methods including but not limited to:

(a)     replacing the manufacturer-installed sear system inside the Rifle (which enables semi-automatic fire) with a third-party sear system which enables automatic fire;

(b)     shaving down part of the manufacturer-installed sear system to change the way it functions and;

(c)     attaching an external device such as a "bump stock" or trigger crank to the weapon.

100.    The parts and tools needed to implement such modifications are relatively cheap.

101.    Parts and tutorials for some or all of the above modification methods are readily available from online sources.

102.    It was eminently foreseeable to Smith & Wesson that its AR-15 style rifles could be easily modified to create a fully automatic weapon or a weapon approximating a fully automatic rate of fire.

103.    In fact, one of the two shooters in the 2015 San Bernardino, California mass shooting wielded a Smith & Wesson M&P-15 rifle that had been modified via the "shaving down" method described above.

104.    This widely publicized event provided Smith & Wesson with even more notice of the ease with which weapons similar to the Rifle can be modified to create a fully automatic weapon or a weapon approximating a fully automatic rate of fire.

105.    This event also provided Smith & Wesson with specific notice that weapons like

27

the Rifle were attractive to mass shooters in part because of their susceptibility to such modifications.

106.     Smith & Wesson committed in the 2000 Settlement Agreement that as a responsible firearms manufacturer it should not "sell . . . a weapon designed in a manner so that with few additional parts and/or minimal modifications an owner can convert the firearm to an illegal fully automatic weapon."

107.     Smith & Wesson could have and should have refused to distribute or sell weapons like the Rifle because, upon information and belief, they were susceptible to modifications like those described above.

108.     Smith & Wesson could have and should have designed firearms like the Rifle so as to prevent or deter such modifications and, thereby, avoid selling prohibited "machinegun[s]" to the general public.

109.     There were a number of economically and technologically feasible design choices Smith & Wesson could have employed to prevent the easy modification of firearms like the Rifle so that they would not function as fully automatic weapons/approximate an automatic rate of fire.

110.     Any of these proposed changes would inhibit dangerous modifications to products like the Rifle, while not diminishing the utility and safety of Smith & Wesson firearms in lawful activities.

111.     For example, making internal components of the Rifle such as the sear system out of less malleable metal and alternate configurations would prevent modification or degradation of weapons like the Rifle into fully automatic weapons/weapons approximating a fully automatic rate of fire.

28

112.    Smith & Wesson chose to design the Rifle in a manner that made it able to be easily modified or degraded to fire automatically.

113.    Smith & Wesson knowingly sold firearms, including the Rifle, which were designed to be and were, in fact, capable of ready modification to function as automatic weapons or approximate the rate of fire of automatic weapons with minimal expenditure of cost or effort.

114.    Smith & Wesson is thus responsible, either directly or as accomplices or co-conspirators, for violations of § 922(b)(4)'s prohibition on the sale of "machinegun[s]."

**The Shooter Fell Within the Dangerous Category of Consumers and Was Foreseeably Motivated by Smith & Wesson's Advertising and Design**

115.    The Shooter fell within the dangerous category of consumers targeted by Smith & Wesson's unfair and deceptive marketing and design tactics.

116.    The Highland Park Shooter fits the profile of the young consumer Smith & Wesson's military and law enforcement-associated, adrenaline-focused marketing of the M&P rifle series is designed to attract.

117.    As documented through his social media footprint, the Shooter's interest in firearms was clearly tied to his obsession with the military, law enforcement, and the glorification of violence, which rendered him a prime target for Smith & Wesson's youth-targeted, military- and law-enforcement-slanted, and adrenaline-focused advertising.

118.    For years before the Incident, the Shooter expressed his fascination with military and law-enforcement-related violence in both his real-life and online activities. His online footprint—and offline actions—reveal his militaristic delusions and a twisted hero complex.

119.    In the backyard of his mother's home, the Shooter filmed himself painting a life-

size soldier with a yellow smiley face holding an assault rifle[9]:



120.    In music videos glorifying violence, the Shooter filmed himself standing next to (and sometimes wearing) an American flag with a tactical vest and helmet of the sort typically worn by law enforcement officials[10]:

---

[9] Josh Boswell & Paul Farrell, *July Fourth gunman Robert Crimo videoed himself building his tiny home in the backyard of his parents' house and painitng armed solder on their wall*, DAILYMAIL.COM (July 6, 2022), https://www.dailymail.co.uk/news/article-10986199/July-Fourth-shooter-Robert-Crimo-built-tiny-home-backyard-parents-house.html.

[10] Becky Sullivan, *Highland Park suspect's online history reveals a fascination with violence*, NPR (July 5, 2022), https://www.npr.org/2022/07/05/1109844728/highland-park-suspects-online-history-reveals-a-fascination-with-violence;%20https://www.thedailybeast.com/robert-bobby-crimo-person-of-interest-in-highland-park-parade-massacre-is-rapper-with-creepy-videos.

30



121.    The Shooter photographed himself wearing an FBI baseball cap,[11] and at least one of his online videos was addressed to an imaginary FBI agent[12][13]:

---

[11] Pilar Melendez et al., *Inside the Murder Obsessed Posts of Parade Massacre Suspect*, DAILY BEAST (July 5, 2022), https://www.thedailybeast.com/robert-bobby-crimo-person-of-interest-in-highland-park-parade-massacre-is-rapper-with-creepy-videos.

[12] *Robert "Bobby" E. Crimo III / Awake the Rapper*, KNOW YOUR MEME, https://knowyourmeme.com/photos/2398591-robert-bobby-e-crimo-iii-awake-the-rapper (last visited Sept. 27, 2022).

[13] Josh Boswell & Paul Farrell, *July Fourth gunman Robert Crimo videoed himself building his tiny home in the backyard of his parents' house and painitng armed solder on their wall*, DAILYMAIL.COM (July 6, 2022), https://www.dailymail.co.uk/news/article-10986199/July-Fourth-shooter-Robert-Crimo-built-tiny-home-backyard-parents-house.html.



**awake.rip** @awake_rip · Jun 18, 2021



122. The Shooter was also the administrator of a Discord social media channel named "SS,"[14] presumably after the "Schutzstaffel," the self-described "political soldiers" of Nazi Germany, responsible for unspeakable acts of violence and mass murder.

123. In September 2020, the Shooter attended a Blue Lives Matters rally in Highland Park and became violent, physically pushing and intimidating counter-protesters.

124. During a "Protect the Results" vigil held in Highland Park in December 2020, a group of individuals, including the Shooter, participated in a counter-protest and were observed "doing Nazi salutes and screaming statements that they 'refused to accept a socialist-communist America . . . and wouldn't rest until the Antifa scum and Black Lives Matter monkeys get put in

---

[14] Pilar Melendez et al., *Inside the Murder Obsessed Posts of Parade Massacre Suspect*, DAILY BEAST (July 5, 2022), https://www.thedailybeast.com/robert-bobby-crimo-person-of-interest-in-highland-park-parade-massacre-is-rapper-with-creepy-videos.

their place.'"[15]

125.    In April 2022, the Shooter entered a local Highland Park synagogue during a
Passover service before being promptly asked to leave.

126.    On July 2, 2022—two days before the Incident—the Shooter posted racist
messages on social media, including "retarded jews" and "orientals should be gassed and
washed." Four days before that he posted those messages, he posted "i say we just get rid of the
blacks all together."

127.    The Shooter's obsession with first-person shooter games further exemplifies his
susceptibility to the "halo effect" tactic pursued by Smith & Wesson by associating its M&P
assault rifle line with the military and police. The Shooter was an avid player of Call of Duty, the
first-person shooter game where users play as a member of the military or law enforcement,
which he began playing as a teenager.

128.    The Shooter posted dozens of clips online of himself playing Call of Duty,
including one where he is positioned on a rooftop and using an assault rifle to unload hundreds
of rounds into a crowd of civilians below him.

129.    The Shooter also used trailer footage from the 2009 release of the Call of Duty
franchise installment—Call of Duty: Modern Warfare 2—in a music video that he posted online,
which features a soldier wearing a tactical vest and helmet (eerily similar to the one worn by the
Shooter above) standing over a body:

---

[15] *Our Voice: Recognizing the Foot Soldiers of Fascism*, ARK VALLEY VOICE (July 11, 2022),
https://arkvalleyvoice.com/our-voice-recognizing-the-foot-soldiers-of-fascism/.



130. Smith & Wesson's presentation of its products—including weapons like the Rifle—as having an association with noble warriors in the United States military and law enforcement agencies fueled a false narrative that possessing a Smith & Wesson product would enable someone to adopt the heroic, military mantle the Shooter craved.

131. The Shooter, consistent with Smith & Wesson marketing emphasizing the ability of M&P weapons like the Rifle to rapidly burn through large amounts of ammunition and destroy many targets, planned to use the Rifle to engage in the massacre at the Highland Park parade because it would enable him to inflict the most carnage quickly. In fact, the Shooter owned at least 4 other firearms—a Remington 700 bolt-action rifle, a foldable Kel-Tec Sub 2000 rifle, a shotgun, and a Glock handgun—yet chose to use his M&P 15 to carry out his attack precisely because, on information and belief, of its military and assaultive qualities, and in particular its efficiency in inflicting mass casualties.

132. The Shooter was a prime target for Smith & Wesson's marketing of the M&P rifle series as associated with the U.S. military and law enforcement agencies, as well as Smith &

34

Wesson's advertisements promising more adrenaline and using imagery associated with first-person shooter video games.

133.     Likewise, at the time of the Highland Park shooting, the Shooter also fit the profile of an impulsive, unstable young man with limited control over his emotional and violent urges. The Shooter has mental health issues, attempted suicide, and exhibited a propensity and desire to commit mass violence. In September 2019, a family member called the police on him after he threatened to "kill everyone" in his family.[16]

134.     According to medical literature, assault weapon advertisements may activate people who are predisposed to violence. Individuals predisposed to violence include many emotionally troubled, young male purchasers of Smith & Wesson's M&P 15 who could be induced or encouraged toward unlawful use of the assault rifle they have purchased by defendant's unfair and deceptive practices.

135.     The Highland Park Shooter was one such emotionally troubled, young male purchaser of Smith & Wesson's M&P 15 who, on information and belief, was induced or encouraged toward unlawful use of his M&P 15 assault rifle by Smith & Wesson's unfair and deceptive marketing tactics and the public image of AR-15-style weapons they promoted.

136.     Defendants' deceptive and unfair marketing acts and practices therefore magnified the lethality of the Highland Park shooting by inspiring the shooter or causing him to select a more efficiently deadly weapon for his attack that is well-suited for offensive military-style combat missions.

---

[16] Emily Hoerner, et al., *Police records paint picture of turbulent home life for alleged sniper in Highland Park mass shooting*, CHICAGO TRIBUNE (July 8, 2022), https://www.chicagotribune.com/news/breaking/ct-highland-park-crimo-family-20220708-n34hdnbcyrhxte6lg7rkfwpskm-story.html.

137.     The fact that a weapon like the Rifle would be used in a hate-motivated mass shooting was also predictable in light of the history of guns being used in hate-fueled shootings in the United States.

138.     Upon information and belief, the Shooter would not have acquired the Rifle or used it in the Incident but for his exposure to the reckless, deceptive, and illegal marketing campaign disseminated by Smith & Wesson.

139.     As a result of the incident, Plaintiff Turnipseed sustained gunshot-related injuries, including severe pain and suffering and emotional distress.

140.     The Shooter's hateful attack with an AR-15 style weapon like the Rifle was both entirely foreseeable and entirely preventable.

141.     Smith & Wesson's marketing of the M&P 15 Rifle to civilians for offensive assault missions was a substantial factor in causing Plaintiff's injuries. As shown above, the Shooter had twisted and violent fantasies about being a soldier and was, therefore, especially susceptible to militaristic marketing.

142.     The Shooter selected the M&P 15 Rifle for his assault from among an arsenal that included various less lethal arms—a Remington 700 bolt-action rifle, a foldable Kel-Tec Sub 2000 rifle, a shotgun, a Glock handgun, 16 knives, a sword, and a dagger—and specifically chose the M&P 15 not only for its functional capabilities, including its assaultive qualities and efficiency in inflicting mass casualties, but also because of its marketed association with the military.

143.     The Shooter was also a devoted player of first-person shooter games featuring variants of the M&P 15 Rifle, and he employed techniques taught in those games to enhance the lethality of his assault on the parade.

36

144.    The Shooter's attack, had it occurred at all, would have been less lethal and the carnage less grievous if the Shooter had not been encouraged by Smith & Wesson's marketing campaign to select the M&P 15 Rifle as his weapon of choice.

***Crimo Jr.'s Negligence Also Proximately Caused The Shooting***

145.    At all relevant times, the Shooter lived with his father—Crimo Jr.—and was dependent on him for shelter, food, health care, transportation, and financial assistance.

146.    Crimo Jr. had actual or constructive knowledge of the Shooter's troubled history, violent fantasies and tendencies, mental health issues, attempted suicide, and desire to commit mass violence.

147.    Crimo Jr. knew that the Shooter attempted to commit suicide in April 2019.

148.    Crimo Jr. also knew that five months later, in September 2019, the Shooter threatened to "kill everyone" in his family and that the police were called to his residence by a family member concerned about the Shooter's threat to commit mass violence.

149.    Crimo Jr. also knew that when the police arrived at his residence to investigate the threat in September 2019, the police searched the minor Shooter's bedroom and confiscated 16 knives, a dagger, and a sword belonging to the minor Shooter. Rather than allowing the police to retain the confiscated property, Crimo Jr. told the police that the 16 knives, dagger, and sword belonged to him, even though they were found in the Shooter's bedroom.

150.    In December 2019, the Shooter—then a 19 year-old minor—asked Crimo Jr. to sponsor his FOID application so that he may obtain a FOID card and purchase firearms before he turned 21. Crimo Jr. agreed.

151.    As such, in December 2019—8 months after the Shooter attempted suicide and just 3 months after the Shooter threatened to "kill everyone" in his family—Crimo Jr. submitted

37

a signed, notarized affidavit indicating that he has agreed to sponsor the Shooter's FOID

application and submitted an affidavit to the Illinois State Police Firearms Services Bureau that

stated, in relevant part:

> I hereby give my consent for this minor applicant to possess and acquire firearms and firearm ammunition and understand *I shall be liable for any damages resulting from the minor applicant's use of firearms or firearm ammunition*. (Emphasis added.)

152.    The Shooter was thereafter issued his FOID card in January 2020, and later that

year, purchased the Rifle that he would use to murder 7 people and injure 48 others at the

Highland Park July Fourth Parade.

153.    Though Crimo Jr. knew that the Shooter had a troubled history, exhibited violent

tendencies, had significant mental health issues, attempted suicide, and displayed a desire to

commit mass violence, Crimo Jr. allowed the Shooter to store the semiautomatic assault Rifle,

along with tactical gear and ammunition, in his residence and to freely access the Rifle whenever

the Shooter wanted to.

154.    Crimo Jr. also failed to notify police that the Shooter purchased and possessed the

Rifle, even though they had recently responded to the Shooter's suicide attempt and threat to

commit mass violence.

155.    Instead, Crimo Jr. allowed the Shooter to freely access and use the Rifle, both in

and out of his residence.

156.    All Defendants other than the Shooter thus had actual or constructive knowledge

of the risk that their actions/omissions might enable hateful and disturbed individuals exactly like

the Shooter to arm themselves with weapons like the Rifle and transform their violent fantasies

into lethal realities.

157.    All Defendants directly and proximately caused Plaintiff's injuries.

38

**FIRST CAUSE OF ACTION**
**Violation of Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq.***
**(Against Defendant Smith & Wesson)**

158.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

159.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act,

815 ILCS 505, et seq. provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration should be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

160.    As described in detail above, while conducting trade or commerce, Smith &

Wesson engaged in deceptive and/or unfair acts or practices by:

(a)    engaging in marketing campaigns that targeted impulsive young men with

military complexes who were particularly likely to be attracted to the unique

ability of AR-15 style weapons;

(b)    engaging in marketing campaigns that targeted adolescents drawn to the

excitement and risk-taking associated with militaristic weapons or combat

missions, including young players of popular and realistic first-person shooter

video games like Call of Duty, which prominently feature variants of the weapons

sold by Smith & Wesson in real life; and

(c)    marketing their AR-15 style weapons as well-suited for civilians to carry out

offensive military-style combat missions against their perceived enemies.

39

161.    Smith & Wesson marketed the Rifle to civilians for criminal purposes, and its wrongful marketing tactics caused or contributed to the Highland Park massacre.

162.    As described throughout this Complaint, Smith & Wesson unethically, unfairly, and unlawfully promoted its M&P 15 Rifle for offensive, military style missions by publishing advertisements that: (i) invoke the violent first-person shooter video game aesthetic by encouraging young people to "Experience real-life first-person shooting with the Smith & Wesson M&P rifle" and "Experience more adrenaline"; (ii) promise that the Rifle "is capable of handling as many rounds as you are"; (iii) depict soldiers on patrol armed with M&P 15 Rifles; (iv) feature the slogan "KICK BRASS," and promise shooters "Pure Adrenaline" when they "burn through all the ammunition you want"; (v) tout, unlike any other firearm it sells, that the M&P 15 Rifle comes with 30-round magazines; (vi) promote sales by giving away 5 free 30-round magazines with the purchase of the M&P 15 Rifle; (vii) claim that military and police professionals use M&P 15 Rifles, including for combat; (vii) invoke lone wolf imagery by depicting an individual dressed in tactical gear aiming an M&P 15 Rifle above the slogan, "The Chosen One"; (viii) glorifying the lone gunman, (ix) glorifying lone gunman assault; and (x) promoting the M&P 15 Rifle's militaristic and assaultive capabilities.

163.    Smith & Wesson marketed, and continues to market, its M&P 15 Rifle in the ways described herein despite evidence of their increasing use in mass shootings.

164.    Smith & Wesson directed its marketing and advertising to the market generally, as well as to the public at large.

165.    The association between Smith & Wesson products and military and law enforcement personnel is false, unfair, deceptive, and unlawful.

166.    Smith & Wesson's targeting of its marketing campaign at youth is unfair and

40

unlawful.

167.     Smith & Wesson marketed its firearms in a way that attracted and enabled dangerous persons like the Shooter.

168.     Smith & Wesson's deceptive and unfair marketing practices encouraged, facilitated, and magnified the lethality of the Highland Park shooting and caused the injuries for which Plaintiff seeks to recover.

169.     The requested relief would serve the interests of consumers by prohibiting Smith & Wesson's unfair and deceptive practices, reducing the risk that vulnerable or high-risk users would be encouraged to acquire and unlawfully use an assault rifle.

170.     Smith & Wesson's unlawful marketing foreseeably caused the Shooter to select and utilize the Rifle to complete his twisted, delusional fantasy as a heroic warrior fighting what he wrongly believed was his noble war.

171.     The Shooter selected the M&P 15 Rifle for his assault from among an arsenal that included various less lethal arms——a Remington 700 bolt-action rifle, a foldable Kel-Tec Sub 2000 rifle, a shotgun, a Glock handgun, 16 knives, a sword, and a dagger——and specifically chose the M&P 15 not only for its functional capabilities, including its assaultive qualities and efficiency in inflicting mass casualties, but also because of its marketed association with the military.

172.     The Shooter was also a devoted player of first-person shooter games featuring variants of the M&P15 Rifle and that he employed techniques taught in those games to enhance the lethality of his assault on the parade.

173.     The Shooter's attack, had it occurred at all, would have been less lethal and the carnage less grievous if the Shooter had not been encouraged by Smith & Wesson's marketing

campaign to select the M&P 15 Rifle as his weapon of choice.

174.    Further, Smith & Wesson does not identify its M&P assault rifles as NFA weapons in its marketing or advertising, leading people to believe that they can obtain these weapons without complying with the NFA's requirements.

175.    Upon information and belief, Smith & Wesson violated both the NFA and the Gun Control Act ("GCA") by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes, or registering the firearms.

176.    As a direct and proximate cause of Smith & Wesson's violation of the ICFA, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

177.    Smith & Wesson continues to act in violation of the ICFA by continuing to perpetrate the irresponsible, misleading, and unlawful advertising described above.

178.    These actions continue to pose a threat to all members of the public, including Plaintiff, and significantly impact the health and safety of the public, including Illinois residents.

179.    In addition to monetary damages, Plaintiff also seeks injunctive relief under the ICFA that prohibits Smith & Wesson from falsely representing its products as being commonly used by, endorsed by, or associated with United States military/law enforcement personnel and unfairly and unlawfully targeting youth in their marketing.

**SECOND CAUSE OF ACTION**
Negligence
**(Against Defendant Smith & Wesson)**

180.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

181.     Smith & Wesson had, at all relevant times, a duty to market and design their

firearms in a manner that would not create an unreasonable risk of harm to others.

182.     Smith & Wesson breached its duty by engaging in the deceptive, unfair, and

unlawful marketing practices described above. Not only did these marketing practices breach

Smith & Wesson's common law duties, they also constituted knowing violations of the ICFA,

the Illinois Criminal Deceptive Advertising Statute, 720 ILCS 5/17-5.7, and the Nevada

Deceptive Trade Practices Act, NRS § 598.0915.

183.     Smith & Wesson negligently marketed the Rifle to civilians for criminal purposes,

and its negligent marketing tactics caused or contributed to the Highland Park massacre, as well

as Plaintiff's injuries.

184.     In addition, Smith & Wesson knowingly violated the National Firearms Act,

which classifies a machinegun as "any weapon which shoots, is designed to shoot, or can be

readily restored to shoot, automatically more than one shot, without manual reloading, by a

single function of the trigger[.]" In order to manufacture or transfer any NFA weapon, a

company is required to fill out the appropriate transfer forms, get approval of the forms by the

Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), pay occupational and transfer

taxes, and register the firearms.

185.     Upon information and belief, the Smith & Wesson M&P assault rifle used by the

Shooter at the July 4th Parade in Highland Park was a machine gun because it can be easily

modified or converted into a machinegun—without the need for advanced equipment or

mechanical skills—and therefore was designed to shoot automatically.

186.     However, the Smith & Wesson Defendants marketed the rifle as not requiring NFA paperwork, and, upon information and belief, it manufactured and transferred the rifle without complying with any of the NFA's requirements, in violation of the Gun Control Act and the NFA.

187.     Upon information and belief, if Smith & Wesson had complied with the requirements of the NFA, the Shooter would not have been able to access the weapon.

188.     Smith & Wesson's negligence and knowing violations of law were a direct and proximate cause of harm to the Plaintiffs, by influencing and permitting the Shooter to purchase the assault weapon and use it to fire upon parade-goers on July 4, 2022.

189.     As a direct and foreseeable result of Smith & Wesson's breach of its duty of care, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

### THIRD CAUSE OF ACTION
### Negligence
### (Against the Gun Store Defendants)

190.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

191.     The Gun Store Defendants have a duty to exercise reasonable care in distributing and selling firearms and large capacity magazines and to refrain from engaging in any activity creating reasonably foreseeable risk of injury to others. A breach of such a duty constitutes negligence.

192.     In or around June or July 2020, Bud's Gun Shop sold the Rifle to the Shooter

through an online transaction.

193.    Upon information and belief, to consummate this sale, the Shooter provided Bud's Gun Shop with his residential address at least twice—both when he created an account with the website and when he provided the billing address associated with his method of payment.

194.    Upon information and belief, the Shooter resided in Highland Park or Highwood and identified his address as residing in Highland Park or Highwood when he created his Bud's Gun Shop online account and when he provided the billing address associated with his method of payment.

195.    Both Highland Park and Highwood make it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine." Highwood, Ill., Code of Ordinances, Tit. 6, § 6-7-2(A); Highland Park, Ill., Code of Ordinances, Tit. XIII, § 136.005.

196.    The Rifle purchased by the Shooter is an assault weapon under the Highland Park and Highwood municipal ordinances.

197.    Yet, despite that Bud's Gun Shop knew that the Shooter resided in Highland Park or Highwood, where it is illegal to acquire or possess an assault weapon, it sold the Rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

198.    Upon information and belief, Bud's Gun Shop then shipped the Rifle to Red Dot Arms for Red Dot Arms to complete the transfer to the Shooter.

199.    Upon information and belief, in June or July 2020, Red Dot Arms transferred the Rifle to the Shooter after conducting a background check and verifying the identification of the Shooter.

200.    Upon information and belief, both the federal transaction form and the Shooter's identification card would have shown that he resided in either Highland Park or Highwood, both of which prohibited the Shooter from acquiring or possessing an assault weapon like the Rifle.

201.    Upon information and belief, despite knowing that the Shooter resided in a municipality that prohibited the possession of assault weapons, Red Dot Arms transferred the Rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

202.    Both Gun Store Defendants are federally licensed gun dealers and are therefore obligated to know and comply with the relevant firearm laws. In fact, among numerous other resources made available to them, is a booklet entitled "Federal Firearms Regulations Reference Guide," which contains federal, state, and local laws applicable to firearm sales –including the Highwood and Highland Park Assault Weapon Ban Ordinances.

203.    In addition, the Gun Store Defendants knowingly violated the National Firearms Act, which classifies "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger[.]"  In order to transfer any NFA weapon, a company is required to fill out the appropriate transfer forms, get approval of the forms by the ATF, pay transfer taxes and register the firearms.

204.    Upon information and belief, the Smith & Wesson M&P Rifle used by the Shooter at the July 4th Parade in Highland Park was a machine gun because it can be easily modified or converted into a machinegun – without the need for advanced equipment or mechanical skills – and therefore was designed to shoot automatically.

205.    However, the Gun Store Defendants transferred the Rifle without complying with any of the NFA's requirements.

206.    Upon information and belief, if the Gun Store Defendants had complied with the

46

requirements of the NFA, the Shooter would not have been able to access the weapon.

207.    The Gun Store Defendants' negligence and knowing violation of law were a direct and proximate cause of harm to Plaintiff by causing the Shooter to gain unlawful possession of an assault weapon that he used to shoot and terrify the Plaintiff.

208.    As a direct and foreseeable result of the Gun Store Defendants' negligence, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

## FOURTH CAUSE OF ACTION
### Assault and Battery
### (Against Defendant Crimo III)

209.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

210.    On July 4, 2022, with malicious intent, the Shooter fired more than 80 rounds into the crowd of people below him using the Rifle, killing 7 people and inflicting gunshot wounds on 48 others, including Plaintiff.

211.    The foregoing conduct was deliberate and outrageous and was conducted with the intent to cause injure, maim, and kill Plaintiff and everybody else attending the parade.

212.    As a direct and foreseeable result, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

### FIFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### <u>(Against Defendant Crimo III)</u>

213.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

214.    On July 4, 2022, with malicious intent, the Shooter fired more than 80 rounds into the crowd of people below him using the Rifle, killing 7 people and inflicting gunshot wounds on 48 others, including Plaintiff.

215.    The foregoing conduct was deliberate and outrageous and was conducted with the intent to cause unfathomable emotional distress to Plaintiff and everybody else attending the parade.

216.    As a direct and foreseeable result, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

### SIXTH CAUSE OF ACTION
### Negligence and Negligent Infliction of Emotional Distress
### <u>(Against Defendant Crimo III)</u>

217.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

218.    The Shooter had a duty not to engage in activity that would create an unreasonable risk of harm to others and to utilize the Rifle in a reasonable manner.

219.    The Shooter breached his duty of care owed to Plaintiff when he fired the Rifle in a careless, reckless, and indiscriminate manner. Such conduct directly caused Plaintiff substantial injury.

220.    At the time of the Incident, the Shooter knew or should have known that firing the

48

Rifle in careless, reckless, and indiscriminate manner could lead to significant harm to people attending the parade.

221.    It was entirely foreseeable that the Shooter's breach of the duty of care owed to Plaintiff would cause significant injury and/or death to the people attending the parade.

222.    As a direct and proximate cause of the Shooter's negligent and reckless act or omissions set forth herein, Plaintiff was negligently struck by a bullet.

223.    As a direct and foreseeable result, Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

## SEVENTH CAUSE OF ACTION
### Negligence and Negligent Infliction of Emotional Distress
### (Against Defendant Crimo Jr.)

224.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

225.    A parent residing in Illinois has a duty to exercise reasonable care to control his or her minor child and prevent it from intentionally harming others, if the parent: (a) knows or has reason to know that he or she has the ability to control the child, and (b) knows or should know of the necessity and opportunity for exercising such control. Restatement (Second) of Torts § 316, at 123–24 (1965).

226.    Crimo Jr. knew or should have known that he had the ability to control his son, the Shooter, at all relevant times, as both a minor and adult, because:

        (a)    The Shooter was financially dependent upon him for shelter, food, health care, transportation, and financial assistance;

(b)     The Shooter lived with Crimo Jr. in his two-story residence; and

(c)     Specifically relevant to this case, the Shooter, as a 19 year-old minor, could not have obtained a FOID card—or purchased the M&P 15 semiautomatic assault rifle that was used to kill 7 people and injure 48 others on July 4, 2022—without Crimo Jr.'s agreement to serve as the parent-sponsor of the Shooter's FOID application.

227.    Crimo Jr. owed a duty of care to Plaintiff because:

(a)     Crimo Jr. controlled the minor Shooter's ability to obtain a FOID card;

(b)     Crimo Jr. agreed to serve as the parent-sponsor for the minor Shooter's FOID card;

(c)     Crimo Jr. controlled the purchase and acquisition of the Rifle by the minor Shooter;

(d)     Crimo Jr. allowed the minor Shooter to store the Rifle, ammunition, and other tactical gear at his residence;

(e)     Crimo Jr. had actual or constructive knowledge of the minor Shooter's troubled history, violent fantasies and tendencies, mental health issues, attempted suicide, and desire to commit mass violence;

(f)     Crimo Jr. had actual or constructive knowledge that the minor Shooter attempted to commit suicide in April 2019;

(g)     Crimo Jr. had actual or constructive knowledge that in September 2019, the minor Shooter threatened to "kill everyone" in his family and that the police were called to his residence by a family member concerned about the Shooter's threat to commit mass violence;

50

(h)     Crimo Jr. had actual knowledge that when the police were called by a

concerned family member in September 2019, the police searched the minor

Shooter's bedroom and confiscated 16 knives, a dagger, and a sword belonging to

the minor Shooter. Far from seeking help for the Shooter from behavioral and

mental health professionals, Crimo Jr. represented to the police that the knives

were his and were being stored in the minor Shooter's closet for safekeeping

(i)     Three months after the minor Shooter threatened to "kill everyone" in his

family, Crimo Jr. agreed to serve as the minor Shooter's parent-sponsor for

purposes of enabling the minor Shooter to obtain a FOID card before he turned

21;

(j)     To serve as the minor Shooter's parent-sponsor of his FOID card, Crimo

Jr. submitted a signed, notarized affidavit to the Illinois State Police Firearms

Services Bureau that, in relevant part, stated:

> I hereby give my consent for this minor applicant to possess and acquire
> firearms and firearm ammunition and understand *I shall be liable for any*
> *damages resulting from the minor applicant's use of firearms or firearm*
> *ammunition.* (Emphasis added.)

228.    Crimo Jr. breached his duty of care owed to Plaintiff by failing to act as

reasonable individuals would under similar circumstances. Despite his knowledge of the minor

Shooter's minor troubled history, violent fantasies and tendencies, mental health issues,

attempted suicide, threat to "kill everyone" in his family, and desire to commit mass violence,

Crimo Jr. nonetheless:

(a)     Agreed to serve as the minor Shooter's parent-sponsor for his FOID card,

just 3 months after the Shooter threatened to "kill everyone" in his family;

(b)     Allowed the Shooter to use his parent-sponsored FOID card to purchase

51

the Rifle—a semiautomatic assault weapon designed to quickly kill, injure, and maim large amounts of people;

(c)      Allowed the Shooter to store the Rifle and ammunition at his residence;

(d)      Allowed the Shooter to store tactical gear at his residence;

(e)      Failed to warn the police that the Shooter purchased and possessed the Rifle; and

(f)      Failed to take any action protect the public, including Plaintiff, from the Shooter.

229.     As a direct and proximate result of Crimo Jr.'s breach of this duty of care owed to Plaintiff, under the same or similar circumstances, Plaintiff has suffered severe physical and emotional harm. This breach is the factual and legal cause of Plaintiffs' harm because:

(a)      But for Crimo Jr.'s failure to exercise reasonable care, the minor Shooter would not have obtained his FOID card or purchased the Rifle in 2020;

(b)      But for Crimo Jr.'s failure to exercise reasonable care, the minor Shooter would not have stored the Rifle at his residence;

(c)      But for Crimo Jr.'s failure to exercise reasonable care, the Rifle would not have been stored in a manner such that it was freely accessible to the Shooter;

(d)      But for Crimo Jr.'s failure to exercise reasonable care, the minor Shooter would not have had the opportunity to possess or train with the Rifle for 2 years before the Incident; and

(e)      But for Crimo Jr.'s failure to exercise reasonable care, the minor Shooter would not have had the opportunity nor the instrumentalities to harm Plaintiff.

230.     As a direct and foreseeable result of Crimo Jr.'s breach of his duty of care,

Plaintiff was seriously injured and has suffered, and will continue to suffer, pain and anguish, emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and has incurred and will continue to incur substantial expenses for medical treatment, and other economic and/or noneconomic damages in amounts in excess of the jurisdictional limits of this Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Elizabeth Turnipseed respectfully requests judgment against the Defendants as follows:

A. For general damages in the sum according to proof and in an amount in excess of the jurisdictional limits of this Court;

B. For special and economic damages;

C. For punitive damages;

D. For loss of earnings;

E. For interest provided by law;

F. For all statutorily allowed damages;

G. For restitution;

H. For an injunction issued against Defendant Smith & Wesson requiring it to cease its illegal, deceptive and/or negligent marketing campaign;

I. For reasonable attorney's fees and costs incurred; and

J. For other and further relief as the Court deems proper.

### JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully Submitted,

**ELIZABETH TURNIPSEED,**

Dated: September 28, 2022

By: _____
One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Ari Scharg (ARDC No.: 6297536)
ascharg@edelson.com
David I. Mindell
dmindell@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
Amy Hausmann
abhausmann@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
Firm ID: 62075


Erin Davis (pro hac vice to be applied for)
edavis@bradyunited.org
Philip Bangle (pro hac vice to be applied for)
pbangle@bradyunited.org
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002
Tel: (202) 370-8100


Donna J. Vobornik
donna.vobornik@dentons.com
Brian E. Cohen
brian.cohen@dentons.com
DENTONS
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel: (312) 876-7370

54